UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

AMY MEEKER, et al.,

                                  Plaintiffs,                    17-CV-5673 (SN)

                 -against-                                       OPINION AND ORDER

PATRICK MCLAUGHLIN,

                                  Defendant.

-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/13/2018

**SARAH NETBURN, United States Magistrate Judge:**

On July 26, 2017, Plaintiffs Amy and Robert Meeker sued Patrick McLaughlin alleging

claims of wrongful adoption, negligence and gross negligence, negligent misrepresentation,

violation of New York General Business Law § 349, intentional infliction of emotional distress,

and Board of Director Liability. They seek damages, interest, any available fees, penalties or

costs under N.Y. G.B.L. § 349, equitable attorneys' fees, and any other relief the court deems

appropriate. The plaintiffs amended their complaint, and McLaughlin timely moved to dismiss

all counts. On May 16, 2018, the Court heard oral argument.

## BACKGROUND

### I.      Factual History

In April 2015, Robert and Amy Meeker adopted a young girl ("C.M.") from a foster

home in China run by Starfish Children's Services ("Starfish"). Am. Compl. ¶¶ 10, 12, 13.

Starfish is not an adoption agency. It is a home that specializes in providing care for children

from the Chinese welfare system with medical conditions. Id. at ¶ 16. McLaughlin was President

of Starfish's Board of Directors until October 2013. Id. at ¶ 11.

From March 28, 2012, to September 27, 2013, Starfish's executive director, Naomi Kerwin ("Kerwin"), ran its day-to-day operations in China. Id. at ¶¶ 14-15, 23.[1] When Kerwin arrived in China, C.M. had already been living at the foster home for more than three years. Id. at ¶ 26. By that point, C.M. had undergone brain surgery that removed 65% of her brain. Id. at ¶ 29. C.M. slept away from the other children because she yelled during the night. Id. at ¶ 34. In July 2012, the foster home discovered that C.M. had been losing weight for eight months, which was reported to the Starfish Board of Directors. Id. at ¶ 38.

On September 25, 2012, Cindy McLaughlin ("Ms. McLaughlin"), an individual associated with Starfish and the wife of McLaughlin, asked Kerwin a series of questions to develop C.M.'s profile for adoption. Id. at ¶ 41. The next day, Kerwin responded in detail about C.M.'s capabilities, explaining that she essentially functioned like an eight-month-old baby and was largely unresponsive to outside stimuli, but noted that the Starfish website description stated that C.M. "likes music and in particular being sung to" and that she "loves to be picked up and cuddled." Id. at ¶ 43.

On October 24, 2012, Ms. McLaughlin asked for an update on C.M. for her and McLaughlin's benefit. Id. at ¶ 44. At that time, C.M. had been diagnosed with epilepsy. Id. at ¶¶ 47-50. A Starfish volunteer nurse, Shanell Williams, created a care plan for her and informed Ms. McLaughlin about the epilepsy and care plan. Id. at ¶ 45, 51. Eight days later, Ms. Williams informed the Starfish Board of Directors about another round of tests and medication. Id. at ¶ 53.

In November 2012, C.M. was matched with a family for adoption. Id. at ¶ 55. On November 17, 2012, Ms. McLaughlin chastised Kerwin for telling the potential adoptive mother

---

[1] Kerwin is the source of much of the plaintiffs' information about C.M. before her adoption.

that C.M. had undergone an MRI without providing any additional information. Id. at ¶ 56. She told Kerwin that there were discrepancies in C.M.'s file that they needed to better understand through medical experts before communicating further about C.M.'s medical history with the family. Id. at ¶ 56. On December 11, 2012, Kerwin wrote that she was worried about C.M.'s adoption because she thought that the family did not have C.M.'s full set of diagnoses. Id. at ¶ 57. This feeling was exacerbated when the prospective mother wrote that she wanted to know if C.M. had any undisclosed health issues, such as seizures. Kerwin wrote to the Board of Directors warning them that the family might not want to adopt C.M. because of her epilepsy. Id. at ¶¶ 61-62. On April 27, 2013, that family decided not to adopt C.M., which Ms. McLaughlin attributed to the family's belief that C.M. was worse off than Starfish had represented. Id. at ¶ 63. At that point, Kerwin was directed not to communicate with prospective adoptive parents again and that the Board would do so from then on. Id. at ¶¶ 64-65. She was further prohibited from communicating with the Yulin Social Welfare Institute, where C.M. then resided. Id. at ¶ 65.

On April 11, 2013, Kerwin sent McLaughlin an e-mail advising him about C.M.'s health and that four previous families had declined to adopt her, including three who had decided not to upon meeting her. Id. at ¶ 71. The Board sent C.M. to Shanghai for testing and excluded Kerwin from any related communications. Id. at ¶ 72. While C.M. was in a series of Chinese foster homes, she was abused by other children and was no longer provided her epilepsy medication. Id. at ¶¶ 75-76. During Skype meetings, Ms. McLaughlin told Kerwin that they only needed to get C.M. adopted and not worry about the consequences; Michael Bosmann, another member of the Board, stated that there was no legal liability for withholding information from prospective parents. Id. at ¶ 77. Kerwin continued to send the Board, including McLaughlin, videos of C.M.'s seizures and kept them current on her medical condition. Id. at ¶ 80.

The plaintiffs, Amy and Robert Meeker, learned about C.M. in May 2013. <u>Id.</u> at ¶ 12. Before proceeding further with the adoption, they reviewed the Starfish website, which stated that Starfish creates a medical history for each child for the entire duration of their time at the foster home. <u>Id.</u> at ¶ 12. After reviewing C.M.'s medical history, the Meekers knew that C.M. suffered from spina bifida, which limited her physical, cognitive, behavioral, and social abilities, and were prepared to care for a child with that specific condition. <u>Id.</u> at ¶ 13.

On June 27, 2013, another doctor confirmed that C.M. suffered from epilepsy. <u>Id.</u> at ¶ 84. In an update email, Kerwin asked the Board, including McLaughlin, whether Amy Meeker wanted any specific testing or evaluations performed. <u>Id.</u> at ¶ 86. Ms. McLaughlin responded by e-mail, with McLaughlin copied, that she would ask Amy Meeker. <u>Id.</u> at ¶ 89. In September 2013, Anne Little instructed Kerwin to put better photographs of C.M. on the website that show her being loved by others, especially because it looked bad that Starfish could not provide Amy Meeker with new pictures. <u>Id.</u> at ¶ 92. Kerwin responded that C.M. did not like to be held and that her condition had deteriorated. <u>Id.</u> at ¶ 93.

Later that month, the Starfish Board informed Kerwin that there would be an agency visit to evaluate C.M. <u>Id.</u> at ¶¶ 94-97. Ms. McLaughlin warned Kerwin to stop asking questions about the reasons behind the visit. <u>Id.</u> at ¶ 99. Kerwin responded by e-mail that she would do her best to put C.M. in the best light possible and that she had "confidence in the integrity of the Starfish Board that [C.M.]'s condition has been clearly communicated." <u>Id.</u> at ¶ 100. McLaughlin answered, recommending that Kerwin change the way that she communicated about C.M.'s condition because she depicted it too negatively, and that she should simply, "smile, nod, and clap when appropriate." <u>Id.</u> at ¶ 101. He further explained that she was not "an advocate for the parents" because "Starfish has done its job and the family takes over accordingly." <u>Id.</u> at ¶ 101.

Kerwin apologized and said she felt assured that the Board had appropriately communicated with the Meekers about C.M.'s condition. Id. at ¶ 102. Kerwin came up with a plan for the agency visit. Id. at ¶¶ 103-06. Kerwin e-mailed the Board to confirm that the Meekers were fully aware of C.M.'s condition, but nobody responded. Id. at ¶¶ 107-08. On September 28, 2013, McLaughlin fired Kerwin. Id. at ¶ 109.

On October 6, 2013, the adoption agency, Faith International, and Amy Meeker (disguised as the cousin of the Faith International representative) visited C.M. Id. at ¶¶ 110-15. The visit lasted fewer than 30 minutes and Kerwin, who attended despite having been recently terminated, did not discuss C.M.'s medical history. Id. at ¶ 114. Afterwards, Kerwin had Olivia's Place, an organization that provides reports on foster children up for adoption, perform physical and speech therapy assessments of C.M. Id. at ¶¶ 116-18. The Board told Kerwin that the assessment was for the C.M. adoption file and would be given to Amy Meeker. Id. at ¶ 119. The Board revised the reports from Olivia's Place to make them more "palatable," but did not provide them to the Meekers before C.M.'s adoption. Id. at ¶¶ 120-24. In October 2013, McLaughlin left Starfish.

When Robert Meeker arrived in China to pick C.M. up at the airport in April 2015, he realized that she was sicker than the Meekers had initially thought, but Starfish declined to provide them with any additional information about C.M.'s medical background. Id. at ¶ 137, see also id. at ¶ 115. Starfish employees provided Mr. Meeker with two bottles of medication with Chinese labels for C.M. without further instruction as to their purpose or use. Id. at ¶ 134. That was the first time he learned about the medication. Id. at ¶ 136.

In July 2015, Kerwin contacted Amy Meeker after viewing her Facebook post about C.M. Id. at ¶ 125. Kerwin then sent Amy Meeker all the medical information she had about C.M.

Id. at ¶ 128. Kerwin claimed that the defendant sequestered C.M. in order to disguise her neglected condition and deliberately withheld information about her so that the adoption would go forward. Id. at ¶¶ 130, 133.

After numerous visits to the doctor, the Meekers learned that C.M. suffered from a host of undisclosed medical ailments, including epilepsy, severely rotten teeth, hydrocephalus, cerebral palsy, scoliosis, brain cerebella dysplasia, self-harming, blindness, deafness, inability to sleep, and hepatitis C. Id. at ¶ 137. The Meekers also learned that C.M. had a severely shortened life expectancy, which they had not initially anticipated. Id. at ¶ 137. The Meekers allege that Starfish, including its Board of Directors, knew about all of C.M.'s health issues but hid this information in an attempt to discharge C.M. from its care. Id. at ¶¶ 138-153. The Meekers quote several reports from medical providers as well as internal Starfish e-mails to show that the Starfish Board knew that C.M. had epilepsy and brain cerebella dysplasia. Id. at ¶ 142. As a result of her condition, the Meekers have incurred more than $500,000 in medical bills treating C.M. and anticipate spending millions more to care for her for the rest of her life. Id. at ¶ 154.

## II.    Procedural History

On March 28, 2016, the plaintiffs sued McLaughlin along with Starfish Children's Services and several other individual defendants in this District. On October 11, 2016, District Judge Katherine B. Forrest dismissed that action for improper venue. Meeker v. Starfish Children's Servs. et al., No. 16-CV-2263 (KBF), 2016 WL 5921084 (S.D.N.Y. Oct. 11, 2016). On March 10, 2017, the plaintiffs filed a complaint alleging the same claims against the same defendants in the U.S. District Court for the Western District of Washington. Meeker v. Starfish Children's Servs. et al., No. 17-CIV-376 (RAJ). On July 28, 2017, the plaintiffs voluntarily

dismissed McLaughlin from that action after he submitted a sworn representation that the court lacked personal jurisdiction. This action followed.

## LEGAL STANDARD

A court may dismiss a complaint for failure to plead a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The pleading standard "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotations omitted). To survive a motion to dismiss, a complaint need only provide "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 359 (2d Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). For plaintiffs to "nudge[ ] their claims across the line from conceivable to plausible," they must "raise a reasonable expectation that discovery will reveal evidence" of the wrongdoing alleged, "even if it strikes a savvy judge that actual proof of those facts is improbable." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

"Claims that sound in fraud are subject to the heightened pleading standards of Fed. R. Civ. P. 9(b), which requires that averments of fraud be 'state[d] with particularity.'" Cohen, 711 F.3d at 359. To provide sufficient particularity, the complaint "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). In addition, the complaint should "plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." Caputo v. Pfizer, Inc., 267 F.3d 181, 191 (2d Cir. 2001) (internal quotations and parentheses omitted).

**DISCUSSION**

I.       **Wrongful Adoption**

Plaintiffs' first cause of action is for wrongful adoption. They allege that McLaughlin fraudulently induced the Meekers to adopt C.M. by providing incomplete medical records and withholding relevant information about her severe medical condition. McLaughlin argues that Texas law governs and that Texas does not recognize a claim for wrongful adoption. In the alternative, he argues that plaintiffs have not alleged adequate facts to hold McLaughlin liable for wrongful adoption under New York law.

A.       **History of Wrongful Adoption Claims**

The term wrongful adoption is somewhat unfortunate. Unlike how it sounds, the adopting parents are not the tortfeasors. Instead, wrongful adoption cases generally involve a fact pattern in which adoption agencies or other informational gatekeepers mislead adoptive parents about their new child's medical or social history. Depending on whether this misconduct was intentional or negligent, wrongful adoption claims sound in fraud, negligence, and/or intentional infliction of emotional distress ("IIED"). Wolford v. Children's Home Soc'y of W. Virginia, 17 F. Supp. 2d 577, 581-84 (S.D. W.Va. 1998) (collecting cases). Wrongful adoption is therefore better viewed as an umbrella term that covers an array of common-law torts in the adoption setting. Indeed, "courts have begun to discard the term, realizing that the question of whether to recognize causes of action for 'wrongful adoption' simply requires the straightforward application and extension of well-recognized common-law actions, such as negligence and fraud,

to the adoption context and not the creation of new torts." <u>Mallette v. Children's Friend & Serv.</u>, 661 A.2d 67, 69 (R.I. 1995) (collecting cases).

The application of these torts in the adoption context began relatively recently. In 1986, the Ohio Supreme Court issued the seminal opinion finding fraud when an adoption agency fabricated a boy's medical and social history to induce his parents to adopt him. <u>Burr v. Bd. of Cty. Comm'rs of Stark Cty.</u>, 23 Ohio St. 3d 69, 73 (1986). The Ohio court issued a narrow decision, noting that its holding rested on traditional common-law fraud principles and did not establish an obligation to disclose pertinent medical information. <u>Id.</u> at 77.

Other states have extended these principles to negligent misrepresentation cases, finding that adoption agencies owe a duty of care to prospective adoptive parents. <u>See, e.g.</u>, <u>Meracle v. Children's Serv. Soc. of Wisconsin</u>, 149 Wis. 2d 19, 32 (1989); <u>Roe v. Catholic Charities</u>, 225 Ill. App.3d 519, 538 (1992). Courts ruling at common law "have invariably premised that duty 'on the adoption agencies' voluntary dissemination of health information concerning the child to potential adopting parents.'" <u>Jackson v. State</u>, 287 Mont. 473, 487 (1998) (quoting <u>Mallette</u>, 661 A.2d at 71). In other words, they have declined to impose a blanket obligation on agencies to provide all pertinent medical and social information to prospective parents. For example, the Supreme Court of Wisconsin held that where an adoption agency made an affirmative representation about the health of the child, it assumed the duty of informing the parents of the child's risk of developing a disease. <u>Meracle</u>, 149 Wis. 2d at 32. But where the agency did not volunteer some information on its own initiative, the Wisconsin court declined to impose a duty to disclose the child's medical history. <u>Id.</u> (noting that its decision "do[es] not hold that agencies have any duty to disclose health information."). Where a statute requires agencies to disclose a child's medical history, however, courts have imposed an affirmative duty. <u>See, e.g.</u>, <u>Wolford</u>,

9

17 F. Supp. 2d at 583 (West Virginia statute imposed duty to disclose on agencies); <u>Gibbs v. Ernst</u>, 538 Pa. 193, 214, (1994) (same for Pennsylvania); <u>McKinney v. State</u>, 134 Wash. 2d 388, 390 (1998) (same for Washington).

Other states have continued the trend of permitting actions against adoption agencies that sound in common-law fraud and negligence. <u>See</u> <u>Dresser v. Cradle of Hope Adoption Ctr., Inc.</u>, 358 F. Supp. 2d 620, 639 (E.D. Mich. 2005) (collecting cases). The few courts that have ruled otherwise did so because the plaintiffs failed to provide an adequate factual basis to support their claims, not because these actions could not lie against adoption agencies. <u>See, e.g.</u>, <u>MacMath v. Maine Adoption Placement Servs.</u>, 635 A.2d 359 (Me. 1993) (no negligence by agency in absence of evidence that agency withheld, or that adoptive parents requested, information); <u>Foster v. Bass</u>, 575 So.2d 967 (Miss. 1990) (no duty breached where agency did not confirm that child was positive for a rare disease).

### B.     Wrongful Adoption in New York and Texas

McLaughlin argues that Texas law governs this claim because the Meekers reside in Texas, and that because Texas law does not recognize the claim of wrongful adoption, the claim should be dismissed. He further contends that even if New York law applies, the case should be dismissed because New York recognizes a claim for wrongful adoption only against adoption agencies, not against foster homes like Starfish.

As described above, the term wrongful adoption encompasses one or more common-law torts that take place in the adoption setting. Here, the plaintiffs' allegations under the claim for wrongful adoption sound only in fraud. For the purposes of this choice-of-law analysis,

therefore, the Court will compare the New York and Texas approaches to fraud claims in the specific context of adoptions.[2]

### 1. Wrongful Adoption in New York

New York courts have consistently applied "common-law fraud principles in the adoption setting." Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 488 (2007); see also Ingrao v. Cty. of Albany, N.Y., No. 1:01-CV-730 (TJM), 2006 WL 2827856, at *13 (N.D.N.Y. Oct. 2, 2006) (denying summary judgment because adoption agency's failure to disclose that child had been abused could evince fraud); Moriarity v. Small World Adoption Found. of Missouri, Inc., No. 5:04-CV-394 (NAM), 2008 WL 141913, at *2 (N.D.N.Y. Jan. 11, 2008) (denying summary judgment because adoption agency's representations in brochure could constitute fraud); Jeffrey BB v. Cardinal McCloskey Sch. & Home for Children, 257 A.D.2d 21, 23 (3rd Dep't 1999) (applying fraud standards to adoption agency's misrepresentation). McLaughlin agrees, but argues that these rulings apply only to adoption agencies. Starfish, and its board, are immune, he contends, because Starfish is a foster home.

McLaughlin cites no law to support his contention, for good reason. New York courts dealing with wrongful adoption claims have made it clear that their rulings are grounded in

---

[2] The New York doctrine of depecage requires the Court to assess the choice of law for each claim separately, even when arising out of the same transaction or occurrence. Bigio v. Coca-Cola Co., 675 F.3d 163, 169 (2d Cir. 2012) ("Under the doctrine of depecage as applied by New York courts, the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate other issues."). In addition to their wrongful adoption claim, the plaintiffs also assert separate claims of negligence and gross negligence, negligent misrepresentation, intentional infliction of emotional distress, and Director Liability. The parties' briefs both make arguments under New York law with respect to these claims and "such implied consent is, of course, sufficient to establish the applicable choice of law." Arch Ins. Co. v. Precision Stone, Inc., 584 F.3d 33, 39 (2d Cir. 2009) (quoting Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 514 n. 4 (2d Cir. 2001)). This is particularly appropriate where, as here, the parties limited their robust discussion of choice-of-law to the wrongful adoption claim.

common-law fraud. And just as an adoption agency may be liable for fraud, so too can a foster home. This is especially true for a home that takes an active role in placing children because of the opportunity to interact with, and make representations to, potential adoptive parents.

### 2. Wrongful Adoption in Texas

McLaughlin maintains that his survey of Texas law failed to uncover any discussion of wrongful adoption, resulting in a conflict between New York law (which recognizes the tort) and Texas law (which he contends by omission does not). The Meekers respond that his search was too cursory to conclude that Texas does not recognize the tort. Moreover, they contend, after an "Erie guess" the Court would conclude that Texas law on wrongful adoption mirrors New York law because Texas recognizes similar torts and the trend among other states is to recognize wrongful adoption. See In re Vebeliunas, 332 F.3d 85, 90–91 (2d Cir. 2003) ("In the absence of controlling authority, this Court must attempt to determine how the [state supreme court] would resolve this issue.").

The Court has not found any relevant Texas Supreme Court case law, but finds instructive Friedman v. Gladney Center, No. 2-08-188-CV, 2009 WL 383861, at *3 (Tex. App. Feb. 12, 2009). In that case, the Texas Court of Appeals assessed whether an adoption agency's failure to disclose pertinent medical information to adoptive parents violated common-law fraud principles. Id. at *3 & n.7. Although the Texas court concluded that the facts did not support a claim of fraud, its decision indicates that fraud claims in the adoption setting are appropriate as a matter of law. An intermediate state appellate court's reasoned judgment should not be "disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237 (1940). The Court has found no evidence to show that the Texas Supreme Court would decline to

follow the <u>Friedman</u> court's reasoning, and thus finds that Texas law recognizes fraud claims in the adoption setting.

### 3.    Choice of Law

"A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law." <u>Fieger v. Pitney Bowes Credit Corp.</u>, 251 F.3d 386, 393 (2d Cir. 2001). Under New York law, the first step in the Court's choice-of-law analysis is to ascertain whether there "there is an actual conflict between the laws of the jurisdictions involved." <u>In re Allstate Ins. Co. (Stolarz)</u>, 81 N.Y.2d 219, 223 (1993). "In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." <u>Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.</u>, 363 F.3d 137, 143 (2d Cir. 2004). If there is a conflict, "[t]he New York Court of Appeals has held that 'the relevant analytical approach to choice of law in tort actions in New York' is the '[i]nterest analysis.'" <u>GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.</u>, 449 F.3d 377, 384 (2d Cir. 2006) (quoting <u>Schultz v. Boy Scouts of Am., Inc.</u>, 65 N.Y.2d 189, 197 (1985)). The operative question at this stage therefore is whether New York and Texas law on wrongful adoption coincide.

The Court concludes that both New York and Texas permit fraud claims in the context of adoptions. Because common law fraud under Texas and New York law are substantively identical, there is therefore no conflict and no need to continue the choice-of-law inquiry. <u>Compare</u> <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 291 (2d Cir. 2006) ("Under New York law, '[t]o state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury.'"), <u>with</u> <u>Johnson v. World</u>

<u>All. Fin. Corp.</u>, 830 F.3d 192, 198 (5th Cir. 2016) ("Under Texas law, the elements of fraud are (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury."); <u>accord</u> <u>In re Enron Corp. Sec.,</u> <u>Derivative & ERISA Litig.</u>, 761 F. Supp. 2d 504, 520 (S.D. Tex. 2011) ("Because there is no difference in the substantive law relating to fraud and civil conspiracy to defraud under New York and Texas law, this Court does not need to conduct a conflict-of-law analysis as to those causes of action."); <u>HSA Residential Mortg. Servs. of Texas v. Casuccio</u>, 350 F. Supp. 2d 352, 363 (E.D.N.Y. 2003) (finding "no material conflict with respect to the fraud claim" between Texas and New York law).

The Court applies New York law.

**C.      Analysis**

Under New York law, the elements of a claim for fraud are: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." <u>Crigger v. Fahnestock & Co.</u>, 443 F.3d 230, 234 (2d Cir. 2006); <u>accord</u> <u>Ross</u>, 936 N.Y.S.2d at 515 (elements of fraud in wrongful adoption case). Where a claim for fraud is based on a material omission, the complaint also must allege a duty to disclose. <u>See</u> <u>Lerner</u>, 459 F.3d at 292; <u>accord</u> <u>Kaufman v. Cohen</u>, 307 A.D.2d 113, 760 N.Y.S.2d 157, 165 (1st Dep't 2003); <u>see also</u> <u>Mandarin Trading Ltd. v. Wildenstein</u>, 16 N.Y.3d 173, 179, 944 N.E.2d 1104 (2011). A duty to disclose arises "where the parties enjoy a fiduciary relationship" or "where one party

possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." Lerner, 459 F.3d at 292. Plaintiffs must satisfy the heightened pleading standards of Rule 9 to survive a motion to dismiss a fraud claim. See In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) (a fraud claim must specify "the who, what, when, where, and how: the first paragraph of any newspaper story").

### 1. Statements or Omissions Attributed to McLaughlin

To begin with, it is not alleged that that McLaughlin ever had any direct contact with the Meekers. As alleged in the amended complaint, his only relevant statements were directed to Executive Director Naomi Kerwin. Specifically, on September 25, 2013, McLaughlin sent an email to Kerwin admonishing her to stop being "an advocate" for the Meekers. McLaughlin stated that the family "is prepared for the unknown," and that Kerwin's focus on the child's severe medical condition would only lead to "buyers [sic] remorse." He stated that Kerwin's "role now is to smile, nod and clap when appropriate if asked about [C.M.]." Am. Compl. at ¶ 101.

New York law recognizes a fraud claim where the defendant made a misstatement to a third party with the intent that it be communicated to the plaintiff and that the plaintiff rely on it. See Eaton Cole & Burnham Co. v. Avery, 83 N.Y. 31, 35 (1880) ("if A. makes the statement to B. for the purpose of being communicated to C. or intending that it shall reach and influence him, he can be so held"). This theory was recently reaffirmed by the New York Court of Appeals. See Pasternack v. Lab. Corp. of Am. Holdings, 27 N.Y.3d 817, 828 (2016) ("indirect communication can establish a fraud claim, so long as the statement was made with the intent that it be communicated to the plaintiff and that the plaintiff rely on it"); see also Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 310 (2d Cir. 1994) ("a claim for fraud may lie even

when a plaintiff does not directly rely on a fraudulent representation made by the defendant, if (1) the plaintiff received the information from someone who had received it from the defendant, and (2) the defendant intended the misrepresentation to be conveyed to [the plaintiff]") (citations omitted). Accordingly, the Court considers whether plaintiffs have adequately alleged (i) that McLaughlin's statement constitutes a misrepresentation, (ii) that he intended Kerwin to convey to the Meekers, and (iii) that the plaintiffs, in turn, relied on the misrepresentation.

While plaintiffs interpret McLaughlin's "smile, nod and clap" statement as an implicit direction to withhold critical medical information, this ambiguous statement is not particularized enough to state a fraud claim. Indeed, in the context of the email as a whole, this statement could easily be interpreted as a direction to be more positive, focusing on C.M.'s attributes and not her deficits. Plaintiffs fail to explain why such a statement is fraudulent. To the extent Kerwin expressed McLaughlin's message of positivity (and avoidance of negative remarks), plaintiffs merely allege that Kerwin "did not offer any information about [C.M.'s] medical or background information" and "kept the meeting as sterile as possible." Am. Compl. ¶¶ 114-15. Thus, plaintiffs fail to allege that they relied on Kerwin during their visit and following McLaughlin's statement.

To the extent plaintiffs allege that McLaughlin's statement is evidence of fraudulent concealment, they have not alleged that McLaughlin owed the Meekers a duty to disclose C.M.'s medical records. Generally, New York courts have recognized a duty to disclose in the context of direct business transactions where one party has superior knowledge over another. See Lerner, 459 F.3d at 291. A duty to disclose has also been imposed on a manufacturer who has exclusive knowledge of a product defect or danger. See, e.g., Miele v. Am. Tobacco Co., 2 A.D.3d 799, 803 (2d Dep't 2003). See also Garcia v. Chrysler Group LLC, 127 F. Supp. 3d 212, 235-36

(S.D.N.Y. 2015) (canvasing cases and discussing New York law as establishing a duty to disclose as a result of a fiduciary or confidential relationship, or during an arms' length transaction where one party has superior knowledge). Because the Meekers do not allege (and cannot establish) a business transaction with McLaughlin, or a fiduciary or confidential relationship, they cannot sustain a fraudulent concealment claim against McLaughlin.

### 2. Statements or Omissions Attributed to the Starfish Board

Alternatively, the plaintiffs contend that Starfish failed to provide a complete medical history for C.M., and that as President of the Board of Directors, this omission by the agency can be imputed to him. Specifically, the plaintiffs allege that they relied on the Starfish website, which provided that Starfish "create[s] a medical history file for each child that details their history from the day they arrived to the day they are adopted." Am. Compl. ¶¶ 12-13. Instead, Starfish presented a misleading portrait of C.M.'s health during in-person meetings and on its website. C.M. suffers from many more medical conditions than they originally anticipated, including epilepsy and a shortened life span. The complaint further alleges that McLaughlin and the rest of the Starfish board knew that C.M. was far sicker than presented because staff members consistently warned them about her deteriorating medical state. Finally, plaintiffs allege that these statements or omissions induced the plaintiffs to adopt C.M. because they believed that she suffered only from spina bifida, resulting in significant medical expenses beyond what they originally anticipated. Plaintiffs do not allege any facts that McLaughlin participated in the fraud beyond his role as President of the Board.

Individual corporate directors and officer do not incur personal liability for the torts of their corporation unless they participate in the wrong or authorize or direct that it be done. See Aeroglide Corporation v. Zeh, 301 F.2d 420, 422 (2d Cir. 1962). See also Mills v. Polar

Molecular Corp., 12 F.3d 1170, 1177 (2d Cir. 1993) (director not personally liable for his corporation's contractual breaches unless he assumed personal liability, acted in bad faith or committed a tort in connection with the performance of the contract); DeWald v. Amsterdam Housing Authority, 823 F. Supp. 94, 103 (N.D.N.Y. 1993) ("Case authority overwhelmingly supports the conclusion that voting members of a board cannot be held liable for the corporate entity's resulting acts."); Marine Midland Bank v. John E. Russo Produce Co., Inc., 50 N.Y.2d 31, 44 (1993) ("corporate officers and directors not liable for fraud unless they personally participate in the misrepresentation or have actual knowledge of it"); 14A N.Y. Jur. 2d Business Relationships § 779 ("A director or officer of a corporation is not liable, merely because of his or her official character, for the fraud or false representations of the other officers or agents of the corporation or for fraud attributable to the corporation itself, if such director or officer is not personally connected with the wrong and does not participate in it.").

Beyond the "smile, nod and clap" email, Plaintiffs' amended complaint makes almost no mention of McLaughlin's conduct or role in misrepresenting C.M.'s medical condition to the Meekers. Several paragraphs of the amended complaint allege that McLaughlin was copied on email communications regarding C.M.'s health and care plans. But the plaintiffs do not allege that McLaughlin was personally involved in any decision to modify or whitewash C.M.'s severe medical history.

Plaintiffs allege that a physical therapy report from Olivia's Place that highlighted C.M.'s epilepsy were deemed "too negative" by the Starfish Board, and that the Board "participated in revising the assessments to something that was more palatable." Am. Compl. ¶¶ 121-22. But the complaint does not allege that McLaughlin personally participated in this conduct. Moreover, these modifications are alleged to have been made by November 26, 2013 (after McLaughlin

was no longer on the Board), and the Meekers were not provided with this "more palatable" report until after C.M.'s adoption was finalized. Id. at ¶¶ 123-24. Accordingly, they could not have relied on it in any event.

Plaintiffs' allegations that Starfish engaged in fraud by representing to the plaintiffs that they had C.M.'s complete medical record when Starfish knew it was not disclosing other, more substantial medical issues, may state a claim for fraud against the corporation. But without more particularized claims of fraud against McLaughlin, this claim cannot survive the motion to dismiss. Accordingly, plaintiffs' wrongful adoption claim is DISMISSED. The Court, however, will grant the plaintiffs leave to file a second amended complaint if they can allege more particularized involvement by McLaughlin in the alleged fraud.

## III.  Negligence and Gross Negligence

"Under New York law, a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." Pasternack v. Lab. Corp. of Am., 892 F. Supp. 2d 540, 552 (S.D.N.Y. 2012) (quotation marks omitted). To make out a claim for gross negligence, the plaintiff must show negligence plus "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." AMW Materials Testing, Inc. v. Town of Babylon, 584 F.3d 436, 454 (2d Cir. 2009).

McLaughlin moves to dismiss the negligence claim because New York Not-for-Profit Corporation Law § 720-a shields unpaid members of a nonprofit's board of directors from liability for ordinary negligence. He further argues that both the negligence and the gross negligence claims should be dismissed because he owed no duty to the Meekers. The Meekers respond that McLaughlin cannot rely on this affirmative defense at this stage in the litigation

because the amended complaint does not allege that he is unpaid. They further contend, without much elaboration, that McLaughlin owed them a duty to provide C.M.'s full medical record.

The Section 720-a defense does not apply because there is no indication in the complaint that McLaughlin is unpaid. Johnson v. Medisys Health Network, No. 10-CV-1596 (ERK)(VVP), 2011 WL 5222917, at *19 (E.D.N.Y. June 1, 2011) ("[D]efendants cannot avail themselves of the § 720–a defense at the motion to dismiss stage unless it is clearly established on the face of the Complaint.").

To state a claim for negligence, the plaintiffs must allege that McLaughlin owed them a duty that was breached. The amended complaint alleges that McLaughlin owed the Meekers the duty to disclose C.M.'s entire medical record, but it fails to detail whether this duty derives from statute or the common law. From the face of the amended complaint, the Meekers do not allege any statutory duty to disclose this information. At oral argument, the Meekers' counsel pointed to New York Social Services Law and case law that imposes a duty on certain entities to disclose pertinent medical information in the adoption context.

New York Social Services Law § 373-a creates a duty upon an "authorized agency" to provide medical histories of children who are freed for adoption to the child's prospective adoptive parents. The statute further defines "authorized agency" to mean "[a]ny agency, association, corporation, institution, society or other organization [licensed] by another state . . . approved by the department [and that] complies with the regulations of the department." N.Y. Soc. Serv. Law § 371(10). See also Ingrao, 2006 WL 2827856, at * 12 (imposing statutory duty on Albany county social services agency in adoption context).

McLaughlin plainly does not qualify as an "authorized agency" such that any statutory duty might be imposed on him personally to disclose C.M.'s medical history to the plaintiffs.[3]

Because the Court finds that no statutory duty exists, the Court will considers whether McLaughlin had a common-law duty to disclose C.M.'s medical history to the Meekers. Cases have considered a duty to disclose medical records in the adoption context where a "special relationship" exists. See Ingrao, 2006 WL 2827856, at * 12 (noting that a "special relationship" is necessary absent statutory duty to disclose); see also Cuffy v. City of New York, 69 N.Y.2d 255, 260 (1987) (discussing the elements of a "special relationship"). These cases, however, all involved government agencies and the duties they owe (or do not owe) to the citizens that they serve and protect. See DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 198 (1989). Plaintiffs have not identified any cases where the court imposed a common law duty to disclose information on a private actor.

Even if the Court would impose such a duty upon McLaughlin based on his role in C.M.'s adoption, the plaintiffs have not alleged any basis to find that McLaughlin had a special relationship with the Meekers that would impose upon him personally a duty to disclose C.M.'s medical records to her prospective adoptive parents. Again, the Court takes no position on whether Starfish, by virtue of its voluntary disclosures, owed the Meekers a duty of care and could be held liable for failing to disclose fully C.M.'s conditions. Accordingly, the plaintiffs

---

[3] There is also no allegation in the complaint that Starfish—which is not a defendant in this action— would qualify as an "authorized agency." N.Y. Soc. Serv. Law § 371(10) (requiring that the agency, among other things, be approved by any New York Social Services department and place children for adoption in the State of New York).

have failed to state a claim for negligence or gross negligence, and these claims are DISMISSED with prejudice. Such failing cannot be cured by amendment.[4]

## III.    Negligent Misrepresentation

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Hydro Inv'rs, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000). "A claim for negligent misrepresentation must also satisfy the requirements of Rule 9(b)." AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec. LLC, 254 F. Supp. 2d 373, 389 (S.D.N.Y. 2003).

To determine if a special relationship exists, "a fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 103 (2d Cir. 2001) (quoting Kimmell v. Schaefer, 89 N.Y.2d 257, 264 (1996)).

The plaintiffs have failed to allege facts that establish a special relationship of trust and confidence between them and McLaughlin. In fact, there is no allegation that the Meekers ever

---

[4] In the alternative, the Court dismisses the negligence and gross negligence claims as duplicative of plaintiffs' negligent misrepresentation claim. See Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Oregon, Inc., 156 F. Supp. 3d 348, 363 (E.D.N.Y. 2016) (collecting cases in which courts dismissed a negligence claim that was largely coextensive with the negligent misrepresentation claim).

knew of him, much less relied upon him. Moreover, for the reasons discussed in the wrongful adoption section, the plaintiffs have failed to allege negligent misrepresentation with sufficient particularity. Plaintiffs' negligent misrepresentation count is also DISMISSED with prejudice.

**IV.     New York General Business Law § 349**

The plaintiffs concede that New York General Business Law § 349 does not apply. This count is DISMISSED with prejudice.

**V.     Intentional Infliction of Emotional Distress**

Under New York law, "[t]o sustain a claim for intentional infliction of emotional distress (hereinafter, "IIED"), a plaintiff must demonstrate: '(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress.'" Druschke v. Banana Republic, Inc., 359 F. Supp. 2d 308, 314 (S.D.N.Y. 2005) (quoting Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996)). "To satisfy the first element, plaintiff must allege conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Furthermore, the conduct alleged must be intentionally directed at plaintiff and lack any reasonable justification." Jones v. Trump, 971 F. Supp. 783, 787 (S.D.N.Y. 1997), aff'd, 1998 WL 1967891 (2d Cir. Sept. 21, 1998) (internal quotation marks omitted). "[U]nder New York law, an intentional infliction tort may be invoked only as a last resort to provide relief in those circumstances where traditional theories of recovery do not." Salmon v. Blesser, 802 F.3d 249, 256 (2d Cir. 2015) (internal quotation marks omitted).

"It is well established that the one-year statute of limitations set forth in CPLR § 215(3) for intentional torts is applicable to claims for intentional infliction of emotional distress."

<u>Mariani v. Consol. Edison Co. of New York</u>, 982 F. Supp. 267, 273 (S.D.N.Y. 1997), <u>aff'd sub nom.</u> <u>Mariani v. Consol. Edison Co.</u>, 172 F.3d 38 (2d Cir. 1998) (collecting cases).

McLaughlin argues that the complaint's IIED claim is time-barred because the statute of limitations ran either in April 2016 (one year after C.M.'s adoption) or October 2014 (one year after McLaughlin left Starfish). He further contends that the behavior alleged in the complaint does not rise to the heightened threshold for IIED claims. The Meekers allege that McLaughlin's conduct was outrageous and that the statute of limitations should be equitably tolled.

The plaintiffs have failed to provide any explanation for why this case should be equitably tolled. Assuming, without finding, that the statute of limitations for an IIED claim against McLaughlin began to run in April 2015, when they adopted C.M., plaintiffs' first case in this District was filed on March 28, 2016, at the end of the limitations period. Plaintiffs then waited five months following the October 11, 2016 dismissal before filing in the Western District of Washington. The statute of limitations expired during this delay. Although they refiled their claims against McLaughlin in this District immediately after they were dismissed from the federal court in Washington, they have not demonstrated diligence in pursuing this claim. <u>Torres v. Barnhart</u>, 417 F.3d 276, 279 (2d Cir. 2005).

In the alternative, in light of the paucity of allegations against McLaughlin personally, plaintiffs have failed to establish extreme and outrageous conduct. Plaintiffs' IIED claim is DISMISSED with prejudice, and the Court declines to grant leave to amend on futility grounds.

## VII.    Director Liability

The Meekers' final count in the complaint is labeled "Board of Director Liability," brought under New York Not-For-Profit Corporation Law § 720-a. This statute, however, does not create a private right of action but rather immunizes certain non-profit directors and officers

24

for conduct in their official capacity, unless such conduct constitutes gross negligence or an intentional tort. Thus, there can be no "Board of Director Liability" claim, and the gross negligence, negligent misrepresentation and fraud claims are dismissed on other grounds. Accordingly, this claim is DISMISSED with prejudice as well.

## CONCLUSION

For the foregoing reasons the Court GRANTS McLaughlin's motion to dismiss in its entirety. All claims are dismissed with prejudice with the exception of plaintiffs' wrongful adoption claim, which is dismissed without prejudice. Plaintiffs may elect to file a second amendment complaint stating only a claim for wrongful adoption under New York law if they believe they can allege facts consistent with this opinion. See Discussion Part I(C)(2). Any second amended complaint must be filed within 30 days of this order. If plaintiffs elect not to file a second amended complaint, the Court will dismiss plaintiffs' wrongful adoption claim with prejudice and close this case.

The Clerk of the Court is respectfully requested to terminate the motion at ECF No. 38.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:     July 13, 2018
           New York, New York

25