USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/31/2019

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

**AMY MEEKER, et al.,**

                    **Plaintiffs,**

          -against-

**PATRICK MCLAUGHLIN,**

                    **Defendant.**

-----------------------------------------------------------------X

**17-CV-5673 (SN)**

<u>**OPINION AND ORDER**</u>

**SARAH NETBURN, United States Magistrate Judge:**

      Defendant Patrick McLaughlin moves to dismiss the second amended complaint (the "SAC") for failure to state a claim. The SAC was filed after the Court's July 13, 2018 Opinion dismissing the claims asserted by Plaintiffs Amy and Robert Meeker in their first amended complaint (the "FAC"). The Court's opinion dismissed their claims with prejudice, except it granted leave to amend the pleadings to reformulate their claim for wrongful adoption. Because the Plaintiffs' renewed version has ameliorated the earlier deficiencies, the motion is DENIED.

## BACKGROUND

      The Court assumes the parties' familiarities with the contours of Plaintiffs' allegations. <u>See</u> <u>Meeker v. McLaughlin</u>, No. 17-CV-5673 (SN), 2018 U.S. Dist. LEXIS 117211, at *1-9 (S.D.N.Y. July 13, 2018) (review of allegations in first amended complaint). Plaintiffs claim that Starfish defrauded them by concealing the extent of their adopted daughter's severe medical conditions. Amy and Robert Meeker were prepared to adopt a special needs child; indeed, they specifically sought one out. SAC ¶ 31. They decided to adopt C.M. knowing that C.M. had spina bifida. SAC ¶ 31. But they did not know until the adoption was complete that C.M. also suffered

from: epilepsy, an abnormal palate, rotten teeth, hydrocephalus, cerebral palsy, scoliosis, self-harming tendencies, blindness, deafness, disruptive sleeping, and hepatitis C. SAC ¶ 204.

According to Plaintiffs, Starfish deliberately concealed this information from Plaintiffs in order to induce them to adopt C.M. Id. They have brought an action against Starfish in a related action, although Starfish has failed to appear and has now defaulted. See Clerk's Order, Meeker et al. v. Starfish Children's Serv's et al., No. 2:17-cv-376 (W.D. Wash. Mar. 21, 2018) (ECF No. 34). Here, Plaintiffs bring claims only against Patrick McLaughlin, former President of Starfish's board of directors, alleging that he was personally involved in the fraud. See SAC ¶¶ 188-213.

In its July 13, 2018 Opinion, the Court concluded that the Plaintiffs had failed to plead a claim of fraud against Defendant. First, the Court held that the Plaintiffs had not alleged that Defendant owed them a duty to disclose that would hold him liable for material omissions. Meeker, 2018 U.S. Dist. LEXIS 117211, at *20-23. Second, the Court held that Plaintiffs failed to allege Defendant's personal involvement in the corporate acts of fraud such that he could be held responsible for any fraud by Starfish. Id. at *23-26. The Court granted Plaintiffs leave to file a second amended complaint to allege more particularized involvement by Defendant in the alleged fraud. Id. at *34. Plaintiffs timely filed their SAC, see ECF No. 47, and Defendant subsequently moved to dismiss, see ECF No. 50.

## LEGAL STANDARD

A court may dismiss a complaint for failure to plead a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The pleading standard "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotations omitted). To survive a motion to dismiss, a complaint need provide only "sufficient factual matter, accepted as true, to

2

state a claim to relief that is plausible on its face." Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 359 (2d Cir. 2013) (quoting Iqbal, 556 U.S. at 678).

"Claims that sound in fraud are subject to the heightened pleading standards of Fed. R. Civ. P. 9(b), which requires that averments of fraud be 'state[d] with particularity.'" Cohen, 711 F.3d at 359. To provide sufficient particularity, the complaint "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). In addition, the complaint should "plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." Caputo v. Pfizer, Inc., 267 F.3d 181, 191 (2d Cir. 2001) (internal quotations and parentheses omitted).

## DISCUSSION

### I. Plaintiffs Have Alleged that McLaughlin Had a Special Relationship with the Plaintiffs, Triggering a Duty to Disclose

Plaintiffs allege that McLaughlin had a duty to disclose information regarding C.M.'s medical condition, and that he breached that duty, based on the special facts doctrine. SAC ¶¶ 189-211. The special facts doctrine holds that, "absent a fiduciary relationship between the parties, there is nonetheless a duty to disclose when one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair." Greenman-Pedersen, Inc. v. Berrman & Henigar, Inc., 130 A.D. 3d 514, 516 (N.Y. App. Div. 2015) (citing cases). To establish liability under this doctrine, the plaintiff must allege that the material was "particularly" within the knowledge of one party, and that the information is such that it could not have been discovered by the other party through the exercise of ordinary intelligence. Jana L. v. W. 129th

3

St. Realty Corp., 22 A.D.3d 278, 277 (N.Y. App. Div. 2005); see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 582 (2d Cir. 2005).[1]

Plaintiffs allege in the SAC that McLaughlin possessed superior knowledge over the Plaintiffs, and that the Plaintiffs would not have discovered that information in the exercise of ordinary intelligence. For example, the SAC states:

- In November 2012, shortly after C.M.'s epilepsy diagnosis, Defendant purchased a head stabilizer for C.M. SAC ¶ 69. The earlier complaint did not mention this purchase.

- On June 5, 2013, Kerwin emailed Defendant to inform him that three neurologists had diagnosed C.M. with epilepsy. SAC ¶ 94. Later that day, she also forwarded a medical report prepared by United Family Hospital after a medical exam on May 30, 2013. SAC ¶ 94. The earlier complaint did not discuss either email.

- On June 14, 2013, Kerwin sent another email advising Defendant that C.M. was having two to three "fits" each day, attaching to that email videos of these "fits." SAC ¶ 99.

- On June 17, 2013, Kerwin sent another email advising Defendant that C.M.'s "fits" happen when she is sitting in a chair, lying down, and sleeping. SAC ¶ 101. The first complaint did not discuss this email.

- On June 20, 2013, Kerwin sent Defendant a doctor's report which stated that the doctor had conducted a new EEG and had placed C.M. back on epilepsy medication. SAC ¶ 102. The earlier complaint did not discuss this email.

- On June 26, 2013, Kerwin sent Defendant a photograph of C.M.'s medication called Trileptal, an anti-seizure medication. SAC ¶ 103. The earlier complaint did not discuss this email.

- On July 5, 2013, Kerwin advised Defendant about C.M.'s upcoming tests, difficulty sleeping, and inability to take medication. SAC ¶ 105. The earlier complaint did not discuss this email.

---

[1] Although leave to amend was granted solely to allege facts related to McLaughlin's personal involvement in any corporate fraud, the same facts would support a claim against McLaughlin directly. And because McLaughlin does not raise any objection to pursuing this theory of liability, the Court considers it.

4

- On July 12, 2013, Kerwin emailed Defendant, reporting that C.M. had "7-8 'fits' that last 5 minutes or longer" on a normal day. SAC ¶ 109. She attached to that email a discharge order that prescribed epilepsy medication. SAC ¶ 110.

- From October 10-11, Defendant was included on an email discussion in which Anne Little discussed alterations to a physical therapy report prepared by Olivia's Place. SAC ¶ 160. In this discussion, Anne Little proposed changing the report—which ultimately was never shared with the Meekers—to modify the date that C.M. was "conclusively diagnosed with" epilepsy. SAC ¶ 160. The earlier complaint discussed the Olivia's Place reports, which highlighted C.M.'s epilepsy, but it did not discuss whether Defendant had knowledge of the report. See FAC ¶¶ 117-24.

Altogether, these allegations show that Defendant had received via email: (1) an October 2012 report of an MRI and EEG; (2) a May 2013 medical report from United Family Hospital; (3) a translated June 2013 doctor's report regarding an EEG; (4) a June 2013 photograph of her prescribed medication, Trileptal; (5) a translated report on an EEG performed on July 9, 2013 that diagnosed epilepsy; (6) another translated report on an 8-hour EEG that prescribed anti-epilepsy medication; and (7) results from an October 2013 physical therapy and November 2013 speech assessment from Olivia's place.

These allegations significantly bolster Plaintiffs' claim that McLaughlin was fully aware of C.M.'s extraordinary conditions. McLaughlin argues that he was not the only person or entity that knew about C.M.'s circumstances. He argues that Naomi Kerwin and C.M.'s doctors were all aware of her condition. Accordingly, he contends that he should not be personally responsible because the information was not "peculiarly" his own. McLaughlin does not offer any caselaw to support the proposition that a defendant is absolved of any duty to disclose to a plaintiff if a non-party *also* possesses the at-issue information. It seems to the Court that this is a better argument to challenge whether, through the "exercise of ordinary intelligence," the Plaintiffs could have better uncovered C.M.'s medical conditions. At the motion to dismiss stage, however, Plaintiffs'

5

allegations on this front are enough.[2] See P.T. Bank Central Asia v. ABN AMRO Bank N.V., 301 A.D.2d 373, 378 (N.Y. App. Div. 2003) (question of whether plaintiff could have learned of facts through the exercise of reasonable diligence was not subject to determination on a motion to dismiss).

## II. Plaintiffs Have Alleged that McLaughlin Actively Participated in Starfish Decisions Regarding C.M. Disclosures

The Court previously concluded that the FAC alleged a claim of fraud against Starfish, who is not a defendant in this action. Plaintiffs were granted leave to amend their pleadings to allege facts that tend to show McLaughlin's personal involvement in that fraud. In addition to the new facts discussed above, the SAC specifically pleads facts establishing McLaughlin's responsibility over Starfish's conduct. For example, Plaintiffs repeat allegations regarding the Starfish website and its representations about the medical file for each potential adoptive child. But the SAC adds that as "the President of the board at the time, McLaughlin was responsible for ensuring that [C.M.]'s medical file was updated both internally at Starfish and with the CCCWA." SAC ¶ 26. The SAC further alleges that the Starfish website provided that "day to day operations [were] managed in New York City." SAC ¶ 36. And the SAC states that

---

[2] The SAC also alleges facts that, taken as true, establish why C.M.'s true medical condition was not available through the exercise of normal intelligence. It states that the China Center for Child Welfare and Adoptions (the "CCCWA") is the central hub for potential adoptive families abroad to receive information. SAC ¶ 15. For an American family to adopt a child from China, the family would first choose an accredited adoption agency, complete paperwork with USCIS, and register with CCCWA. SAC ¶ 16. The CCCWA then approves the family, whose adoption agency may then review the CCCWA maintained files regarding each child up for adoption, a file that includes translated medical records and documented special needs. SAC ¶ 18. The CCCWA does not provide any other information, and none of those records is publicly available. SAC ¶ 195. Crucially, CCWA does not gather this information itself; rather it relies on the accuracy of information relayed by foster homes such as Starfish. SAC ¶ 19. These details, which were absent from the first complaint, demonstrate how under Chinese rules and regulations Starfish was the sole conduit of information of C.M.'s health. See also Melvin Decl. ¶¶ 1-10 (ECF No. 47-2) (Assistant Director of Meekers' adoption agency attesting to procedures and regulations for adopting Chinese children).

McLaughlin was the only board member living in New York City at the relevant period. SAC ¶ 37. The Starfish website directed prospective adoptive families to contact McLaughlin if they had questions. SAC ¶ 38. The SAC further alleges for the first time that Starfish's corporate address was registered with the State of Utah (where it was incorporated) as McLaughlin's personal residence, and it was changed to his new residence when McLaughlin moved. SAC ¶ 39. These new allegations establish McLaughlin substantial control and involvement in all Starfish board matters, suggesting that he was not a passive board member.

In addition, the SAC alleges new facts related to McLaughlin's direct effort to prevent the Plaintiffs from learning information from Starfish and specifically his role in silencing Kerwin. It alleges:

- After Kerwin saw that one family considering adopting C.M. believed that C.M. would be able to teach her future brother Chinese, Kerwin emailed Defendant, saying: "I have no idea what is in [C.M.]'s file which was my concern . . . . If everything is correct there is no problem. If the family doesn't have all of the medical information it is better to sort it out now than to have problems when they arrive. Do you agree? From what I know about them is that they want to be sure of what they are getting into, if they are sure they can handle it they will accept her." SAC ¶ 76. The FAC discussed the earlier failed adoption generally, but it did not discuss Defendant's knowledge of Kerwin's concerns. See FAC ¶¶ 55-64.

- On May 23, 2013, Kerwin learned that the Meekers were interested in adopting C.M., and she asked Cindy McLaughlin "How should I keep her updated on progress?" SAC ¶ 90. Cindy McLaughlin then emailed Kerwin, copying Defendant, to tell Kerwin "not to contact the family directly. Any communications and updates should go through Anne Little." SAC ¶ 91.[3]

- On June 17, 2013, Defendant was copied on an email from Anne Little to Kerwin which told Kerwin that they should be "hesitant for any of us to call what [C.M.] has as 'fits' (but which I take it you mean epileptic seizures)." SAC ¶ 100.

- On July 12, 2013 Kerwin asked Defendant and other board members if "Amy Meeker want[s] any specific testing or evaluations?" SAC ¶ 109. The next week, on July 19, 2013, Cindy McLaughlin emailed Kerwin, copying Defendant, saying

---

[3] Cindy McLaughlin is the now-deceased wife of Defendant Patrick McLaughlin.

"I will give this information to Amy Meeker and follow-up with her regarding her desire for more testing." SAC ¶ 112.

- The SAC includes an allegation that Plaintiffs wrote an email to Defendant and the board notifying them that the CCCWA would be transferring C.M.'s file to their adoption agency. SAC ¶ 119. McLaughlin was aware at this time that her file was incomplete. SAC ¶ 120-22. The SAC alleges that it was McLaughlin's obligation, as President, to ensure that C.M.'s complete file was updated with the CCCWA. SAC ¶ 26.

- The SAC clarifies that Defendant was copied on the emails leading up to the agency visit in which the board told Kerwin not to take it upon herself to disclose C.M.'s ailment to the Meekers. See SAC ¶¶ 132-33.

- The SAC adds another crucial detail omitted from the FAC regarding Kerwin's termination. After Defendant sent the "smile, nod and clap" email, and before he fired her, he communicated with the board. He emailed them to say: "We now have a growing mess on our hands and m [sic] gut tells me we should not bombard NK with multiple rebuttals. I am thinking I should harvest a response from each person that has been accused in this note. I will put that together as my master fact sheet to use when I speak to her which has yet to happen. An area I do feel exposed on is the guardianship reality with [C.M.]. . . . Another sunny day soiled from afar." SAC ¶ 147. Later that day, after he sent that email, he decided to fire Kerwin. SAC ¶ 148.

- The SAC also alleges that on October 16, 2013, Defendant emailed Kerwin to reprimand her for attending the agency visit. SAC ¶ 158.

All of these allegations, taken together, demonstrate Defendant's personal knowledge of and involvement in each of Starfish's specific failures to disclose. He was copied on the emails in which his wife lied to Kerwin, telling Kerwin that the Meekers would be informed of the July 2013 epilepsy diagnosis. See SAC ¶¶ 109-117. He knew that the Meekers were going to look at the CCCWA form, a form that ultimately never disclosed an accurate picture of C.M.'s health. See SAC ¶ 119. And he was directly involved in the Board's efforts leading up to the agency visit to ensure, by any means, that Kerwin did not over-communicate. Given his experience with the earlier failed adoption of C.M., Defendant personally knew that Kerwin's instinct was to communicate symptoms of which the potential adopters were ignorant. See SAC ¶ 74-76. His

8

email with the board also demonstrates that he thought this was a potential "mess," that needed addressing. See SAC ¶ 147. In that light, his "smile, clap and nod" email reads as an attempt to prevent communication *even if* the family demonstrated ignorance of material illnesses. See SAC ¶ 144. And his email reprimanding Kerwin for attending the agency visit suggests that he thought by firing her he was also preventing her from potentially overcommunicating during the visit. See SAC ¶¶ 148, 158.

These allegations, taken as true for the purposes of this motion, are sufficient to state a claim of fraud against McLaughlin. See Banks v. Consumer Home Mortg., Inc., No. 01-CV-8508 (ILG), 2003 U.S. Dist. LEXIS 8230, at *32-33 (E.D.N.Y. Mar. 27, 2003) (denying motion to dismiss fraud claim against a corporate officer because the complaint alleged "actual knowledge of the fraud" as well as personal involvement); People v. Apple Health & Sports Clubs, 80 N.Y.2d 803, 807-08 (N.Y. 1992) (affirming temporary injunctive relief meant to prevent fraud because it was "sufficiently likely to be shown at trial that Thurman, as the 50% owner and eventual sole director of Apple Health, had actual knowledge of Apple Health's fraudulent activities"); see also Pludeman v. N. Leasing Sys., Inc., 10 N.Y.3d 486, 493 (N.Y. 2008) (denying motion to dismiss fraud claim against corporate officers because"[a]lthough plaintiffs have not alleged specific details of each individual defendant's conduct, we have never required talismanic, unbending allegations").

In the alternative, Plaintiffs' fraud claim against McLaughlin may also be construed as a claim for aiding and abetting fraud. Under that theory, they would have to show "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006). Plaintiffs raise this theory of liability in their opposition brief,

Pls. Br. at 20-21, and McLaughlin does not address it in his reply brief. Accordingly, the Court will permit the parties to develop this theory of liability and, if appropriate, permit Plaintiffs to conform their pleading to the evidence before trial. See Pls. Br. at note 6.

## CONCLUSION

In sum, the SAC sufficiently pleads a claim of fraud against McLaughlin under the special facts doctrine or under a theory of his participation in the corporate fraud. McLaughlin's motion to dismiss the SAC is DENIED. The Clerk of the Court is respectfully requested to terminate the motion at ECF No. 50.

The parties are ordered to appear at an Initial Pretrial Conference on Tuesday, April 16, 2019, at 10:00 a.m., in Courtroom 219, Thurgood Marshall Courthouse, 40 Foley Square, New York, NY. Within one week of this conference, the parties shall jointly propose a case management plan, consistent with the Court's Individual Rules of Practice.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:  March 31, 2019
        New York, New York